Curtis A. **BREIDER** and Adela Breider, Plaintiffs,

v.

**UNITED STATES of America,** Defendant.

Civ. A. No. 85–C–902.

United States District Court, E.D. Wisconsin.

Aug. 9, 1985.

---

Thomas E. Mountin, Robert E. Meldman, Meldman, Case & Weine, Milwaukee, Wis., for plaintiffs.

Jeffrey D. Snow, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## DECISION and ORDER

TERENCE T. EVANS, District Judge.

Curtis Breider had a secret room. Not as elaborate as some—no removing of a book that causes a bookcase to slide, exposing a passageway through a dingy tunnel to a real secret kind of room—but a secret room nonetheless.

Breider's secret room was in the basement of his home on Imperial Drive in Franklin, Wisconsin. It was hidden behind a pegboard wall, the door to which was camouflaged by hanging tennis rackets, snow shovels, and tools. Breider conducted business in his secret room. At least he conducted business there until November 10, 1984, when his secret room stopped being secret. On that date, some gentlemen from the Milwaukee Police Department came to visit with a search warrant. Breider's business, you see, was bookmaking—not the Publisher's Clearing House type but commercial gambling, prohibited by Wisconsin law.

Breider was charged with commercial gambling. He probably thought his problems were over when he pled guilty to the charge in a Wisconsin court on February 8, 1985 and received a fine of $1,500.00 plus three years of probation supervision. Unfortunately for Breider, his troubles were only beginning.

On March 29, 1985 and again on April 11, 1985, the Internal Revenue Service made jeopardy assessments against Breider for wagering, registry and income taxes alleged to be due. The assessments of wagering tax were for monthly periods ending May 31, 1982 through September 30, 1984. The assessments for the registry tax were for the periods ending April 30, 1982, July 31, 1982, and July 31, 1983. The income tax assessments were for the taxable years ending 1982 and 1983. Petitions for administrative review of these assessments were filed by Breider on April 29, 1985. The petitions for review were denied on May 15, 1985. This suit for judicial review pursuant to Title 26, United States Code, § 7429(b) was filed on June 13, 1985. A hearing was conducted on August 5, 1985. For the reasons that follow, Mr. Breider is entitled to some but not all of the relief that he seeks.

As a result of the search on November 10, 1984, the police found numerous papers containing recorded sports bets and an envelope with ten "Doc's Sports Journals." Mr. Breider, also on November 10, 1984, was interviewed by Milwaukee police detectives and, after being advised of his constitutional rights, said (a) that the betting slips found at his house were bets taken by him for his own financial gain and were in his handwriting; (b) that he had been in the gambling business for two and one-half years, and had been taking bets because he was without a job for the past three years; (c) that he had an average of $20,000.00 in gross bets per week; and (d) that he charged his bettors ten per cent on all losses. This information is contained in a statement that Breider signed. Upon this information, the IRS assessed Breider for unpaid federal taxes.

Title 26, United States Code, § 6861 authorizes the Secretary of the Treasury to immediately assess a deficiency in tax if he believes that the assessment or collection of the deficiency will be jeopardized by delay. Treasury Regulation § 1.6851–1(a) requires a determination that at least one of the following conditions exists for a jeopardy assessment to be made:

(i) the taxpayer is or appears to be designing quickly to depart from the United States or to conceal himself or herself;

(ii) the taxpayer is or appears to be designing quickly to place his, her, or its property beyond the reach of the Government either by removing it from the United States, by concealing it, by dissi-

pating it, or by transferring to other persons;

(iii) the taxpayer's financial solvency is or appears to be imperiled.

■ Given the facts at hand, the IRS could conclude that Breider:

(1) was conducting an illegal commercial gambling business,

(2) made profits from the business

(3) failed to report the profits on his tax returns

(4) had in fact concealed both his business and his profits, and

(5) was of questionable solvency because news of his secret room was out and he would no longer be able to engage in the illegal enterprise, for to do so would be a violation of the terms of his probation.

While the Code itself does not set forth specific guidelines as to what constitutes "reasonableness under the circumstances," for purposes of judging the propriety of a jeopardy assessment the term means something more than "not arbitrary or capricious," and something less than "supported by substantial evidence." *See Loretto v. United States,* 440 F.Supp. 1168 (E.D.Pa. 1977). With the facts at hand here it was reasonable for the IRS to make a jeopardy assessment. Breider's first objection is denied.

In addition to having a reasonable basis for making a jeopardy assessment, the amount of the assessment, to stand, must be "appropriate." Even giving to the Service the deferential nod that it is entitled to receive, I believe the amounts assessed in this case to be excessive and thus not appropriate.

The IRS claims that Breider was engaged in a commercial gambling business for at least two and one-half years prior to the date of the execution of the search warrant. Evidence about the duration of the enterprise comes from Breider himself who told Detective Gary Byers of the Milwaukee Police Department about it during his interview following the arrest. Breider seems to contend that Byers misunderstood his comments, and that he had only been involved in illegal gambling for about two months prior to November of 1984. On this point the government's interpretation of the evidence is more logical, and I have no trouble concluding that there is a reasonable basis for believing the illegal business was in operation since at least May of 1982.

The IRS has reviewed Breider's gambling records for a 16-day period in October of 1984, and determined that the average amount of wagers received during each of those days was $10,825. The IRS has then taken that figure and multiplied it by 365 days to determine the dollar value of a year's worth of wagers received. The IRS then calculated that 4.5% of the wagers received is a reasonable bookmaker's profit and accordingly, it determined that Breider had unreported income of $119,751.76 for 1982 and $178,409.75 for 1983.

■ Based on this projection of unreported income, the IRS has determined that Breider owes $134,296 for back income taxes, $92,529 in penalties, and $23,903, for a total of $250,728 to cover the taxable periods January 1, 1982 through December 31, 1982, and January 1, 1983 through December 31, 1983. A much smaller sum, slightly over $6,000, has been assessed on the wagering and registry claims.

I agree that calculating a bookmaker's profit at 4.5% of gross bets (a method that will produce a result very close to 10% of losing wagers) is reasonable. However, I do not believe it appropriate to arrive at Breider's gross bets by taking an average day's activities during a 16-day period in October and multiplying it through the entire year. Gimbels' sales volume is up during the two middle weeks of December and down during the middle two weeks of March. Bookies are no different. They do a greater business in October, during the height of the professional and college football season than they do in August during the dog days of the baseball season, strike or no strike. Also, it is interesting to note that the government wants me to believe Breider's statement about the duration of his business (two and one-half years) but

apparently not his statement, made during the same interview with Detective Byers, that he took in an average of $20,000 per week in wagers.

I believe here that the police swooped down on Breider during a high time of his business, and that the assessments should reflect that the volume of his business is subject to fluctuations. Also, I presume that even bookies take some time off during the year, and to base an assessment on 365 days of business per year is unfair. Given the fluctuation of the seasons, the popularity of different sports for betting purposes (no bookie could feed his family on what he gets from USFL football games!), Breider's statements and finally his records, I believe that the assessments can be sustained at only 55% of the sums that have been determined. Thus, the assessments are ORDERED reduced by 45%, and as so modified they are AFFIRMED.